UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Devin Sayers,

                    Plaintiff,             CV-04-3907 (CPS)

     - against -                           MEMORANDUM OPINION
                                           AND ORDER
City of New York, Correction Officers
Mitteo Ferro (Shield No. 14663) and
Correction Officer Miguel Nieves (Shield
No. 13021), individually and in their
official capacities,

                    Defendants.

----------------------------------------X

SIFTON, Senior Judge.


        Plaintiff Devin Sayers ("Sayers") brings this action against

defendant City of New York ("City"), Correction Officer Mitteo

Ferro ("Ferro"), and Correction Officer Miguel Nieves

("Nieves")to recover damages for injuries plaintiff suffered

when, seated in his wheelchair, he fell backwards while riding in

the back of a police van.[1]  Plaintiff alleges that the City and

the two correction officers who were riding in the front of the

van, were deliberately indifferent to plaintiff's safety and

medical needs.  Plaintiff alleges federal claims against all

defendants under 42 U.S.C. § 1983, for violations of the First,

_____

        [1]  Plaintiff's original complaint was filed on September 10, 2004
against defendant City of New York and John Does 1-10.  Plaintiff filed his
First Amended Complaint on January 13, 2005.  Plaintiff filed a Second Amended
Complaint on March 9, 2005, discontinuing all claims against John Does 1-10
and asserting claims against Correction Officers Ferro and Nieves.

Eighth, and Fourteenth Amendments.[2]  In addition, plaintiff
states claims against all defendants for violations of § 202 of
the Americans with Disabilities Act ("ADA") and § 504 of the
Rehabilitation Act.  Plaintiff also states common law claims
against all defendants for negligence,[3] gross negligence, and
negligent infliction of emotional distress.[4]  Pursuant to Federal
Rule of Civil Procedure 56, defendants moved for summary
judgment, seeking dismissal of all claims.[5]  For the following
reasons, defendants' motion is granted in part and denied in
part.

## Background

The following facts are drawn from the parties' depositions,
affidavits, exhibits, and Local Rule 56.1 statements.  Disputes
are noted.

---

[2] Plaintiff alleged a claim under the Fourth Amendment in his Second
Amended Complaint, but has since withdrawn that claim.  *See* Plaintiff's
Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment
("Plaintiff's Opposition Memorandum"), p. 19.

[3] Plaintiff specifically alleges that the City was negligent "in
screening, hiring, retaining, training, and supervising the correction
officers who failed to properly restrain plaintiff in the van."  Second
Amended Complaint ¶ 27.  Plaintiff also asserts that "the City is vicariously
liable for the acts of its employees herein pursuant to the doctrine of
*respondeat superior*." *Id.*

[4] Plaintiff alleged state law claims of intentional infliction of
emotional distress and prima facie tort in his Second Amended Complaint, but
has since withdrawn those claims.  *See* Plaintiff's Opposition Memorandum, p.
19.

[5] Defendants have, however, withdrawn their motion with respect to the
claims of negligence.  Defendants' Reply Memorandum, p. 12.

Plaintiff Sayers is a New York resident and paraplegic[6] who has been confined to a wheelchair since 2000.[7] Defendant City is a municipal corporation organized under the laws of the State of New York. Defendants Ferro and Nieves are correction officers for the New York City Department of Correction ("DOC"). On May 21, 2004, plaintiff was arrested on charges of assault. He was incarcerated at the New York City Police Department 120th Precinct until his arraignment on May 23, 2004. After his arraignment, plaintiff was remanded to the DOC's custody as a pre-trial detainee. On May 23, 2004, plaintiff, confined to a manual wheelchair, was transferred to the custody of defendants Ferro and Nieves for transportation from the Staten Island Courthouse to the Riker's Island detention facility. Plaintiff, who was handcuffed, was pushed in his wheelchair into a DOC handicapped accessible van by the use of a ramp. A non-disabled prisoner was also transported with plaintiff in the DOC van. One officer pushed plaintiff into the van and positioned plaintiff's wheelchair on the right side of the vehicle.[8] Plaintiff's Exh.

---

[6] Paraplegia is "[p]aralysis of both lower extremities and, generally, the lower trunk." Stedman's Medical Dictionary, 27th ed., p. 1313.

[7] On May 3, 2000, at the age of 20, plaintiff was the victim of gunshot wounds that rendered him paraplegic and wheelchair-bound.

[8] Evidence conflicts as to the direction plaintiff was facing when he was positioned inside the police van. Defendant correction officer Ferro testified that plaintiff was facing "the passenger side doors." Def. Exh. K, Ferro Dep., p. 47. When asked "So the driver's facing forward, Mr. Sayers was facing the passenger's side?", Ferro responded, "Yes, facing the door." *Id*. Plaintiff testified that he was "facing sideways," towards the "passenger side

3, Sayers Dep., p. 50. The wheelchair was placed over two metal anchors in the floor of the van. Straps were attached to these anchors. Plaintiff states that correction officers Ferro and Nieves put the straps through the back wheels of the wheelchair and crossed them over his waist "like a seatbelt." The officers "clicked" the straps into place in the metal anchors on the floor of the van. Plaintiff told defendant officers he could fall if they did not also strap his front wheels down. The officers stated that "this is our procedure, that "this is how we have to do it," and locked the wheels of his wheelchair. They did not strap down the two front two wheels.[9]

Around 2:00 pm, while approaching the Verrazano Bridge towards Manhattan at a moderate speed, plaintiff's wheelchair tipped backwards. Plaintiff hit his head on the window of the van and landed on part of his back. Plaintiff felt pain on his right side. He called for help and told the prisoner riding with

_____

of the van." However, when asked if he was "looking directly forward to the front of the van," plaintiff responded, "Yes." Plaintiff's expert, Dr. Hobson, notes that "[a] front-facing orientation is 'industry standard'" and further states that "plaintiff's wheelchair was improperly positioned facing the passenger side of the DOC van." Plaintiff's Exh. 1, Declaration of Expert Douglas A. Hobson, PhD Bioengineering, who describes himself as a nationally recognized expert in wheelchair transportation safety, ¶¶ 12-13. Dr. Hobson's declaration assumes that plaintiff was facing the side of the van, but plaintiff's testimony may be interpreted by a finder of fact that what he meant by "facing the passenger side of the DOC van" was that he was placed behind the passenger seat of the van, facing forward.

[9] Defendant officer Ferro testified that he did attach the straps to the front wheels as he did for the rear wheels. Def. Exh. K, Ferro Dep., p. 60. He testified that he did not secure a strap over plaintiff's waist as described by plaintiff. *Id.* He also testified that he did not recall whether plaintiff Sayers told him that he was not strapped in properly. *Id.* at p. 62.

him in the van "to let the guy know that I needed medical
attention." Plaintiff's Exh. 3, Sayers Dep., p. 72. The
prisoner informed the officers that plaintiff was hurt. Officer
Nieves testified that he heard a loud crash in the back of the
van and heard plaintiff screaming. After plaintiff fell, the
officers stopped the van at Hicks Street in Brooklyn near the
Brooklyn House of Detention. Nieves noted that "[i]t took awhile
[to stop] because of traffic. There was a lot of traffic at that
time." Plaintiff's Exh. 4, Nieves Dep., p. 85. The officers
opened the door of the van and attempted to return plaintiff to
an upright position, but they were unable to do so. Upon
instructions from a dispatcher, they then transported plaintiff
to Manhattan House at 125 White Street in Manhattan, in order for
plaintiff to obtain medical assistance. Defendant officers used
"lights and sirens" when traveling to Manhattan House. *See* Def.
Exh. K, Ferro Dep., p. 78. A Dr. Pedestru examined plaintiff at
the Manhattan House, noted that plaintiff complained of pain in
his ribs, and gave him pain medication. *See* Def. Exh. Q, DOC
Injury to Inmate Report.

At 4:00 pm, an ambulance responded to Manhattan House and
transferred plaintiff to Bellevue Hospital. According to the
Ambulance Call Report, plaintiff complained that his ribs and
right hip hurt. X-rays taken of plaintiff revealed that

plaintiff sustained a contusion on his right hip as a result of the fall.[10]

At 9:55 pm on May 23, 2004, plaintiff was admitted to the Riker's Island jail facility. *See* Def. Exh. E, DOC Report on New Admission. Around three hours later, at 1:03 am on May 24, 2004, plaintiff was "medically processed" by the DOC. *See id.* He arrived at the DOC receiving room intake area at around 2:10 am and was admitted to the health facility. According to plaintiff's Correctional Health medical records, plaintiff reported that his right side hurt "after a minor fall." Parties dispute whether DOC records show that plaintiff had other injuries.[11] Plaintiff states that when he complained of pain in his right hip, the doctor said there was little he could do.

Plaintiff was incarcerated on Riker's Island for six days, from May 23, 2004 to May 29, 2004. Bail was posted on May 28, 2004, and plaintiff was released on May 29, 2004. His girlfriend drove him home in her aunt's truck, which is not handicapped accessible. On June 10, 2004, plaintiff was treated at the emergency room at Staten Island University, where he was diagnosed with a fracture of his inferior pubic ramus. Plaintiff

---

[10] Parties dispute whether the x-ray results showed that plaintiff sustained a fracture. Plaintiff also states that the medical report cited by defendants lists additional injuries. *See* Plaintiff's Rule 56.1 Statement ¶ 28. The illegible handwriting in the medical report does not assist the Court in resolving these factual issues.

[11] The handwriting in the medical records is not clear enough to determine the dispute.

states that this injury caused plaintiff pain for nearly a year and worsened arthritis related to plaintiff's paraplegia.

## Discussion

Jurisdiction

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, Section 202 of the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act. Pursuant to 28 U.S.C. § 1367, supplemental jurisdiction exists over plaintiff's state law claims.

Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order

to defeat such a motion, the non-moving party must raise a genuine issue of material fact. The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

Federal Claims against Defendants Ferro and Nieves

*Qualified Immunity*

Defendants argue that summary judgment on claims against the individual defendants Ferro and Nieves is appropriate because Ferro and Nieves are entitled to qualified immunity.

"Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity provides "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. at 200 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Because

qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," *id.*, qualified immunity questions should be resolved "at the earliest possible stage of litigation." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)) (internal quotations omitted).

"In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established statutory or constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Holcomb v. Lykens*, 337 F.3d 217, 220 (2d Cir. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996)). In order to defeat a qualified immunity defense, "then, [the plaintiff] must allege a deprivation of an actual constitutional right clearly established at the time of the events in issue." *Id.* "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002)). In light of the test outlined above, "[t]he question of qualified immunity is separate from the merits of the underlying action." *Washington Square Post No. 1212 v. Maduro*, 907 F.2d 1288, 1292 (2d Cir. 1990) (citation omitted).

Under the doctrine of qualified immunity, "officials who act in ways they reasonably believe to be lawful [] should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635,

641 (1987). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. Immunity applies "if officers of reasonable competence could disagree" on whether the conduct at issue was unlawful. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Under this test, even if plaintiff could establish constitutional claims against them, defendants Ferro and Nieves are entitled to qualified immunity if their conduct was objectively reasonable, that is, if other officers could reasonably disagree as to whether Ferro's and Nieves' conduct was unlawful. Plaintiff argues that the defendant officers' conduct was not objectively reasonable because they "consciously disregarded obvious safety standards[12], ignored the plaintiff's pleas and left him in horrible pain despite the opportunities to help him . . . ." Plaintiff's Opposition Memorandum, p. 13.

The record does not bear out plaintiff's assertions. Nieves and Ferro testified that they did not receive, nor were they

---

[12] Plaintiff states that facing the front of the vehicle is "industry standard" as established by voluntary industry standards, manufacturers' installation and usage manuals, ADA/DOT regulations, and by wheelchair users instructions dated August 2000 "that were available to DOC." *See* Declaration of Expert Douglas A. Hobson, Plaintiff's Exh. 1, ¶ 12.

Plaintiff further identifies "securement rules" for an occupied wheelchair, which are "industry standard" as established by voluntary industry standards, manufacturers' manuals, ADA/DOT regulations, and by wheelchair users instructions. According to these securement rules: (a) occupied wheelchairs must be secured by four tie down straps, two for the rear wheels and two for the front wheels; (b) the tie down straps must be attached to the wheelchair's frame, not to the wheelchair's wheels; and (c) once secured, the wheelchair must not move more than two inches in any direction. *Id.* at ¶ 14.

required to receive, training from the DOC regarding the safe transport of prisoners in wheelchairs. Absent such formal training, they secured plaintiff as best they could. *See* Def. Exh. K, Ferro Deposition, p. 108 ("I secured Mr. Sayers to the best of my ability in that vehicle."). They strapped a belt through his back wheels and across his waist and locked the wheels of his chair. After plaintiff fell, defendants transported plaintiff to the nearest correctional facility and attempted to set him upright and to contact their supervisor. Dispatch advised them to transport plaintiff to Manhattan House, and defendant officers used lights and sirens to expedite the ride. At the Center, plaintiff was treated by a physician, Dr. Pedestru. An ambulance then transported plaintiff to Bellevue Hospital. No reasonable juror could find that the events taking place in the two-hour period between plaintiff's fall and his transfer to Bellevue Hospital resulted from the defendant officers' clear indifference or knowingly unlawful conduct.

Since the City did not provide training or instructions at the relevant time on how to secure wheelchair-bound prisoners, officers of reasonable competence could disagree on whether Ferro and Nieves acted appropriately when they attempted to secure plaintiff in the van. Captain Roy Vadala ("Vadala"), a New York police officer who serves as a Driver Training Supervisor in the

DOC's transportation division[13], could not provide a clear answer in his deposition testimony as to how secure a prisoner's wheelchair would have to be in order for the prisoner to be transported.[14] Accordingly, defendants Ferro and Nieves are entitled to qualified immunity and plaintiff's federal claims against them are dismissed in their entirety.[15] *See, e.g., Washington Square Post No. 1212*, 907 F.2d 1288, 1292 (2d Cir. 1990) (finding qualified immunity where officers relied on their own experience in assuming nature of searched club's admission policy and relied on reasonable instructions from superior in chain of command).

## Federal Claims against Defendant City

*Section 1983 Claims*

---

[13] As a Driver Training Supervisor for the DOC's transportation division, Captain Vadala investigates vehicle accidents. The primary duties of the transportation division is to "transport any individual inmates that have to be transferred, mainly to courts, Rikers Island, to various court facilities, new admissions from the court facilities . . . ." Def. Exh. N, Vadala Dep., p. 21.

[14] When asked whether the front two wheels of a prisoner's wheelchair must be strapped down before transporting a prisoner from a court facility to a jail, Vadala replied "There's nothing in writing that says that they have to be secured in the front. It is also just a recommendation when they are transported." Def. Exh. M, Vadala Dep., p. 75. According to Vadala, whether the front two wheels must always be strapped down "depends [] [on] the situation . . . ." *Id.* p. 74. When asked what he would do if the prisoner specifically requested that the front two wheels be strapped down, Vadala responded, "I would find out if first we had the equipment. If it was not interfering with any other security, I would do what he asked me to do. I know there's no requirement." *Id.* p. 76.

[15] Specifically, plaintiff's claims against officers Ferro and Nieves, including claims brought under the ADA, the Rehabilitation Act, the First Amendment, the Eighth Amendment, and the Fourteenth Amendment, are dismissed.

1. The *Monell* Doctrine

Plaintiff alleges that the City is liable under 42 U.S.C. § 1983[16] for failing to train its correction officers in the proper securement of wheelchair-bound prisoners in police vehicles.[17] In order to hold a municipality liable as a "person" under 42 U.S.C. § 1983, plaintiff must establish that a government policy or custom caused the deprivation of his constitutional rights.[18] *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91, 694 (1978); *cf. Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[T]o hold a city liable under § 1983, a plaintiff must

---

[16] 42 U.S.C. § 1983 provides that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

[17] The Second Circuit has stated that "[i]t is axiomatic that a successful Section 1983 claim requires more than a showing that one has been wronged at the hands of a state or municipal officer.  Rather, a plaintiff must allege that he has been deprived of some right secured by a federal statute or the United States Constitution."  *Eastway Construction Corporation v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985) (internal citation omitted).  Plaintiff's Section 1983 claim against the City is premised on violations of the First, Eighth, and Fourteenth Amendments. *See* Seconded Amended Complaint ¶ 19.

[18] The Supreme Court has held that "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.

plead and prove three elements: (1) an official custom or policy that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."). The Supreme Court has held "that the inadequacy of police training may serve as the basis for § 1983 liability . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

In order to find § 1983 liability based on the City's failure to train, the plaintiff must "demonstrate both the requisite culpability as well as causation." *Morrissey v. City of New York*, 963 F.Supp. 270, 273 (S.D.N.Y. 1997) (citing *Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997)). With respect to culpability, "failure to train or supervise must amount to . . . a 'deliberate indifference' to the rights of citizens before liability can be imposed." *Id* (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388-89 (1989)). A showing of deliberate indifference requires that "city policymakers made a deliberate choice from among various alternatives not to fully train employees." *Id* (internal citations and quotations omitted)[19].

---

[19] The Supreme Court in *Monell* clarified that such "choices" can manifest in either policy or custom. The Court stated that

local governments, . . . by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to 'governmental custom' even though such a custom has not received formal approval

> Such a deliberate choice could be shown where 'in light of
> the duties assigned to specific officers . . . the need for
> more or different training is so obvious, and the inadequacy
> so likely to result in the violation of constitutional
> rights, that the policymakers . . . can reasonably be said
> to have been deliberately indifferent to the need.'

*Id* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

"Moreover, 'deliberate indifference' constitutes more than merely

'simple or heightened negligence' . . . . [I]t involves a

'conscious disregard' on the part of municipal employees for the

consequences of their actions." *Morrissey v. City of New York*,

963 F.Supp. 270, 273 (S.D.N.Y. 1997) (quoting *Brown*, 520 U.S. at

407). To determine whether a municipality's failure to train or

supervise constitutes deliberate indifference, the Second Circuit

applies a three-prong test:

> (1) the plaintiff must show that a policymaker knows 'to a
> moral certainty' that her employees will confront a given
> situation;
>
> (2) the situation either presents the employee with a
> difficult choice of the sort that training or supervision
> will make less difficult or that there is a history of
> employees mishandling the situation; and
>
> (3) the plaintiff must show that the wrong choice by the
> city employee will frequently cause the deprivation of the
> citizen's constitutional rights.

---

> through the body's official decisionmaking channels. As Mr. Justice
> Harlan, writing for the Court, said in *Adickes v. S.H. Kress & Co.*, 398
> U.S. 144, 167-68 (1970): "Congress included customs and usages [in §
> 1983] because of the persistent and widespread discriminatory practices
> of state officials . . . . Although not authorized by written law, such
> practices of state officials could well be so permanent and well settled
> as to constitute a 'custom or usage' with the force of law."

*Monell v. Department of Soc. Services of the City of New York*, 436 U.S. 658,
691 (1978).

*Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992).

The Supreme Court has stated that a plaintiff may successfully allege a failure-to-train claim without showing a pattern of constitutional violations "in a narrow range of circumstances." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 409 (1997). Under such circumstances, "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id*. Where there is no evidence of other similar occurrences, a plaintiff must show that the alleged constitutional violation "was so 'highly predictable' that it reflected a conscious disregard of the municipality to this deprivation." *Morrissey*, 963 F.Supp. at 275.


2. Culpability and Causation in this Case

Defendants concede the first prong of the *Walker* test. With respect to the other elements plaintiff must demonstrate, Dr. Hobson concluded in his declaration that "failure to provide any formal training [in securing occupied wheelchairs in DOC vehicles] causes a risk of very serious if not fatal injury to all wheelchair bound prisoners who are transported in [DOC vehicles]." Plaintiff's Exh. 1, Hobson Declaration ¶ 22. Hobson further concluded that "[f]ailure [by the DOC to implement

securement policies in accordance with industry recommended standards and ADA regulations] will continue to result in an unnecessary risk of harm and actual injury to wheelchair bound prisoners that are transported by DOC." *Id.* ¶ 28. He also determined, "within a reasonable degree of professional certainty that plaintiff's wheelchair flipped backward [in part] because DOC officers . . . improperly secured plaintiff's wheelchair to the DOC van." *Id.* ¶ 18.

Dr. Hobson's analysis raises issues of fact as to the second prong of the *Walker* test, whether formal training would lessen the difficulty officers face in determining how best to secure an occupied wheelchair. In *Walker*, the Second Circuit identified a "difficult choice" as a situation where "more than the application of common sense is required." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). While common sense could lead a correction officer to believe that securing the wheel locks and tying down the back two wheels of a wheelchair would prevent a wheelchair from falling while a van was moving, Dr. Hobson's analysis and industry standards show that all wheels must be strapped down to limit the risk of serious injury. More training based on this knowledge would lead to securement practices that minimize such risks. Similarly, with respect to the third prong of the *Walker* test and with respect to the question of whether plaintiff's injury was highly predictable,

the risk of serious injury identified by Dr. Hobson raises factual questions as to whether an officer's choices in securing occupied vehicles could lead to frequent deprivations of prisoners' constitutional rights.

Plaintiff has clearly shown that improper securement of plaintiff's wheelchair in the van caused his injury.  The van was moving at a moderate speed when plaintiff fell, and there were no sudden stops or movements that might have otherwise caused plaintiff to fall backwards.  Dr. Hobson specifically opined that the manner in which plaintiff's wheelchair was fastened to the van caused the fall.  Therefore, construing the facts in the light most favorable to plaintiff, I find that plaintiff has raised material issues of fact as to whether the City adequately trained its officers to transport safely wheelchair-bound prisoners.  Accordingly, summary judgment on plaintiff's Section 1983 claim against the City is denied.


*ADA and Rehabilitation Act Claims*[20]

---

[20] Claims brought under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act may be considered together because the statutes' standards are so similar.  *See Weixel v. Bd. of Educ.*, 287 F.3d 138, 146 (2d Cir. 2002) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.").  *See also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Plaintiff alleges that defendants violated the ADA and the Rehabilitation Act (collectively, the "disability statutes"). Title II of the ADA provides that

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. As stated in this Circuit, "the ADA requires only that a particular service provided to some not be denied to disabled people." *Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir. 1999). Section 504 of the Rehabilitation Act similarly provides that

> [n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a) (2000).

In order to state a claim under these acts, a plaintiff must show that: "(1) he or she is 'a qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." *Divine Allah v. Goord*, 405 F.Supp.2d 265, 274 (S.D.N.Y. 2005). The Rehabilitation Act requires a fourth element, that the "entity denying the inmate participation or enjoyment [of

services and benefits offered] receives federal financial
assistance." *Id.*

As a paraplegic, plaintiff is disabled within the meaning of
the disability statutes.  And there is no dispute that the City
of New York is a public entity receiving federal financial
assistance.  Parties dispute, however, the second element
plaintiff must show, that "he or she is being excluded from
participation in, or being denied the benefits of some service,
program, or activity by reason of his . . . disability."  Courts
have recognized that the disability statutes apply to prisoners
who are transported.  *See, e.g, Shariff v. Goord,* 2005 WL
1863560, at *6 (W.D.N.Y. 2005) (finding that wheelchair-bound
inmate plaintiff properly claimed a denial of service by reason
of his disability by claiming that plaintiff was denied safe
transportation to receive medical care); *Candelaria v.
Greifinger*, 1997 WL 176314, at *3 (N.D.N.Y. 1997) (remanding case
for further factual development as to wheelchair-bound prisoner's
claim that prison wagon was not equipped or designed to
accommodate his physical impairments).

In this case, there is a material issue of fact as to
whether plaintiff was denied the benefit of safe transportation
by reason of his disability.  Officers Nieves and Ferro received
no training from the City on the proper securement of wheelchair-
bound prisoners in vans, nor were they aware of any DOC

procedures regarding the transport of such prisoners.
Plaintiff's Exh. 4, Nieves Dep., p. 38.  At the time of this
incident, no official procedures were documented or disseminated.
Several months after the incident, in Warden's Memorandum 64/04,
the DOC established a policy of securing the two rear wheels.
The memorandum states in part that "[o]nce in the vehicle,
position the wheelchair in the desired location and lock the
wheels.  The wheelchair has two large wheels in the rear . . . .
Use the fasteners to secure the large wheels to the vehicle
floor." *See* Plaintiff's Exh. 1, Hobson Declaration ¶ 26.
Plaintiff's expert, Dr. Hobson, states that the manner in which
plaintiff was secured and the procedure outlined in the Warden's
Memorandum do not comply with industry standards and ADA
regulations.  Dr. Hobson further opines that plaintiff's
wheelchair flipped over in part because of this lack of
compliance, and that "failure to provide any formal training [in
securing occupied wheelchairs in DOC vehicles] causes a risk of
very serious if not fatal injury to all wheelchair bound
prisoners who are transported in [DOC vehicles]."  Plaintiff's
Exh. 1, Hobson Declaration ¶ 22.  Construing the evidence in the
light most favorable to plaintiff, and taking into account
defendant City's failure to address whether plaintiff was
properly transported, a reasonable juror could find that
plaintiff was denied the safe transportation to which he was

entitled.  *See Candelaria v. Greifinger*, 1997 WL 176314, at *3

(remanding because the manner in which wheelchair-bound plaintiff

was transported was inadequately addressed by defendant).[21]

Factual questions also exist as to whether plaintiff was

denied the benefit of safe transportation "by reason of" his

disability.  At the time of the incident, plaintiff was

paraplegic, bound to a wheelchair, and without trained assistance

in securing plaintiff in the vehicle.  A reasonable juror could

therefore find that because of those circumstances, plaintiff was

unable to obtain the benefit of safe transportation.  *See*

*Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003)

(holding that District Court did not err in concluding that

"plaintiffs' disabilities were a substantial cause of their

inability to obtain services, or that the inability was not so

_____

[21] Defendants argue that because there was scant evidence of similar incidents involving wheel-chair bound prisoners falling in police vans, this case is an isolated act of negligence and is therefore not actionable under the ADA.  Defendants' Reply Memorandum, p. 6 (citing *inter alia Foley v. City of Lafayette*, 359 F.3d 925 (7th Cir. 2004) (isolated acts of negligence not actionable under the ADA)).  Therefore, defendants argue, the lack of other incidents does not create an "inference of disparate treatment." *Id.*  The Second Circuit has held that where a plaintiff advances a reasonable accommodation claim, he need not establish disparate impact.  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273.  I assume plaintiff is, at the least, bringing a reasonable accommodation claim when he alleges ADA and Rehabilitation Act violations based on "the failure to maintain appropriate policies for the arrest and transportation of persons with spinal cord injuries."  Second Amended Complaint ¶ 21.  When analyzing a reasonable accommodation claim, "the relevant inquiry asks not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." *Id* (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).  In this respect, through expert testimony, plaintiff has raised an issue of fact as to whether wheelchair-bound prisoners are able to access safe transportation under defendant City's current procedures.

remotely or insignificantly related to their disabilities as not to be 'by reason' of them").[22]  Accordingly, summary judgment on the ADA and Rehabilitation Act claims against the City is denied.

## State Law Claims

Plaintiff alleges state law claims for common law negligence, gross negligence, and negligent infliction of emotional distress.

Defendants concede that there are issues of fact with respect to the common law negligence claim, but argue that defendants are nonetheless entitled to good faith immunity. According to the New York Court of Appeals, the standard for this type of immunity is as follows:

> Whether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment. If these functions are essentially clerical or routine, no immunity will attach.... If a functional analysis of the actor's position shows that

---

[22] *See also Henrietta D.*, 331 F.3d at 279-80 (2d Cir. 2003) (holding that

Where the District Court has clearly identified disability-related challenges that make access more difficult for the plaintiff class than for those without disabilities, and has found the accommodative scheme to be "broken," we hold that the plaintiffs have demonstrated that their disabilities are a cause of the denial of access to benefits.)

The Court of Appeals in *Henrietta* carried out its analysis according to the observation that "Title II seeks principally to ensure that disabilities do not prevent access to public services where the disabilities can reasonably be accommodated.  It is a 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" *Henrietta D.*, 331 F.3d at 279 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

> it is sufficiently discretionary in nature to warrant
> immunity, it must then be determined whether the conduct
> giving rise to the claim is related to an exercise of that
> discretion. Obviously, governmental immunity does not attach
> to every action of an official having discretionary duties
> but only to those involving an exercise of that
> discretion.[23]

*Mon v. City of New York,* 78 N.Y.2d 309 (Ct. App. 1991), *quoted in*

*Estate of Rosenbaum v. City of New York*, 982 F.Supp. 894, 896

(E.D.N.Y. 1997); *see also Haddock v. City of New York,* 75 N.Y.2d

478 (1990) ("When official action involves the exercise of

discretion or expert judgment in policy matters, and is not

exclusively ministerial, a municipal defendant generally is not

answerable in damages for the injurious consequences of that

action."). Because defendant correction officers at the time of

the incident were not required at the time to comply with any

particular procedure, their actions regarding how best to secure

plaintiff and assist him after the fall were discretionary in

nature. Accordingly, defendant correction officers Nieves and

Ferro are entitled to good faith immunity on the state law

---

[23] The Court of Appeals explained that

Whether absolute or qualified, this immunity reflects a value judgment
that--despite injury to a member of the public--the broader interest in
having government officers and employees free to exercise judgment and
discretion in their official functions, unhampered by fear of second-
guessing and retaliatory lawsuits, outweighs the benefits to be had from
imposing liability for that injury.

Mon v. City of New York, 78 N.Y.2d 309, 313 (Ct. App. 1991) (citation
omitted).

claims.  *See Mon*, 78 N.Y. 2d 309 (finding that officers'
responsibilities in evaluating qualifications of police officer
candidates and making recommendations for appointments was
"unquestionably" discretionary and therefore officers were
entitled to immunity).

Defendant City, however, is not entitled to such immunity
because there is no evidence that the City made a decision or
exercised discretion regarding how or whether to train officers
in the proper securement of wheelchair-bound prisoners.  In
*Haddock v. City of New York*, the New York Court of Appeals found
lacking in merit the City's contention that it was entitled to
immunity for the discretionary decision to retain an employee who
raped a child.  The court reached this conclusion because "there
is no evidence that, prior to the rape, the City in fact made any
such decision or exercised any such discretion." *Haddock v. City
of New York*, 75 N.Y.2d 478, 485 (Ct. App. 1990).  Here, there is
no evidence that the City, at the relevant time, exercised its
discretion in deciding not to provide formal training or in
deciding not to outline procedures concerning the transportation
of disabled prisoners.  Therefore, I cannot dismiss plaintiff's
negligence claim against the City on the basis of good faith
immunity.

Parties dispute whether defendant City is liable for the
negligent supervision and training of defendant correction

-26-

officers.  Defendants argue that because the defendant officers
were acting within the scope of their employment, the City cannot
be held liable for their negligent supervision and training.  The
question here, however, is whether the City itself was negligent
in not providing training or setting out procedures regarding the
proper securement of wheelchair-bound prisoners.  Whether
plaintiff's injury was a foreseeable consequence of the City's
negligent training of police officers in safe transportation is
an issue to be resolved by a jury.[24]  *See Haddock v. City of New
York*, 532 N.Y.S.2d 379, 381 (Sup. Ct. 1988), *aff'd Haddock v.
City of New York*, 75 N.Y.2d 478 (Ct. App. 1990); *see also
Meitinsky v. City of New York*, 309 N.Y. 998 (Ct. App. 1956)
(proof that police officer had no training in rapid firing with
small arms held to be evidence of negligence by the City).

     Because plaintiffs do not argue in support of their claims

---

[24] In the *Haddock* case, the court found "actionable negligence" against
the City where the City retained an employee to monitor a public playground
after receiving information of the employee's violent criminal history.  Such
an act "subjected those children to a foreseeable risk of harm" and
constituted a "violation of a duty owed to the infant user of a public
playground."  *Haddock*, 532 N.Y.S.2d at 381. The court further stated that

> [i]rrelevant is the trial court's discussion of the issues of whether
> [the employee] was acting in the scope of his employment when he
> attacked the plaintiff, . . . . The doctrine of respondeat superior has
> no relevance in this case where the sole issue is whether the City
> itself was negligent.  Whether the violent assault was a foreseeable
> consequence of the City's negligent retention of [the employee] was an
> issue to be resolved by the jury . . . .

*Id.*
     The City has argued that the City could be held liable under the theory
of *respondeat superior*.  Since none of the parties address whether the City
could be held liable for the negligence of its employees when the employees'
are immune from suit, I need not decide this issue.

for gross negligence and negligent infliction of emotional
distress, I consider that defendants' motion for summary judgment
dismissing these claims is unopposed.  Accordingly, plaintiff's
gross negligence and negligent infliction of emotional distress
claims are dismissed.

For the foregoing reasons, defendants' motion for summary
judgment is granted in part and denied in part.  Plaintiff's
federal and state claims against defendant correction officers
Nieves and Ferro are dismissed.  The state law claims for gross
negligence and negligent infliction of emotional distress are
also dismissed.  Summary judgment is denied on claims brought
against the City under 42 U.S.C. § 1983, the ADA, and the
Rehabilitation Act.  Summary judgment on the state law negligent
training claim against the City is also denied.

## Conclusion

For the reasons set forth above, defendants motion for
summary judgment is granted in part and denied in part.

The Clerk is directed to transmit a copy of the within to
the parties and to the Magistrate Judge.

SO ORDERED.

Dated :   Brooklyn, New York
          March 21, 2007

                    /s/ Charles P. Sifton (electronically signed)
                    United States District Judge